1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALBERT P. ALTO, *et al.*,<br><br>　　　　　　　　　　Plaintiffs,<br><br>　　v.<br><br><br>SALLY JEWELL, Secretary of the United States Department of the Interior, *et al.*,<br><br>　　　　　　　　　　Defendants. | Case No. 11-cv-2276-BAS(BLM)<br><br>**ORDER:**<br><br>**(1) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; AND**<br><br>**(2) GRANTING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>**[ECF Nos. 103, 110]** |

On September 30, 2011, Plaintiffs commenced this declaratory and injunctive-relief action, seeking judicial review of a decision issued by the Assistant Secretary – Indian Affairs ("Assistant Secretary" or "AS-IA") under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), against the Secretary of the Department of the Interior and other federal officials.[1]  Each defendant is sued in his or her respective official capacity.  The complaint was amended once with the First Amended Complaint

---

[1] The current defendants in this action include Sally Jewell, Secretary of the United States Department of the Interior; Kevin K. Washburn, Assistant Secretary of Indian Affairs; Michael Black, Director of the Bureau of Indian Affairs ("BIA") of the Department of Interior; and Robert Eben, Superintendent of the Department of the Interior Indian Affairs, Southern California Agency.  Ken Salazar and Larry Echo Hawk, originally named as defendants, are no longer parties to this action by operation of Federal Rule of Civil Procedure 25(d).

("FAC") being the operative complaint.  This action arises from the approval of a recommendation from the Enrollment Committee of the San Pasqual Band of Diegueño Mission Indians ("San Pasqual Band" or "Band") to disenroll the named plaintiffs from the Band's membership roll.[2]  Now pending before the Court are the parties' cross-motions for summary judgment.

Having reviewed the papers submitted and oral argument from both parties, the Court **DENIES** Plaintiffs' motion for summary judgment, and **GRANTS** Defendants' cross-motion for summary judgment.

# I.    BACKGROUND[3]

"For nearly two centuries now, [federal law has] recognized Indian tribes as 'distinct, independent political communities,' qualified to exercise many of the powers and prerogatives of self-government." *Plains Commerce Bank v. Long Family & Cattle Co.*, 554 U.S. 316, 327 (2008) (citations omitted) (quoting *Worcester v. Georgia*, 6 Pet. 515, 559 (1832)) (citing *United States v. Wheeler*, 435 U.S. 313, 322-23 (1978)).  The "sovereignty that the Indian tribes retain is of a unique and limited character."

---

[2] The following are the named plaintiffs in this action (collectively referred to as "Plaintiffs" or "Marcus Alto, Sr.'s descendants"): Albert P. Alto; Andre E. Alto; Anthony Alto; Brandon Alto; Christopher J. Alto; Chasity Alto; Daniel J. Alto, Sr.; Daniel J. Alto, Jr.; Dominique N. Alto; Raymond E. Alto; Raymond E. Alto, Sr.; Raymond J. Alto; Robert Alto; Victoria Ballew; Angela Ballon; Juan J. Ballon; Rebecca Ballon; Rudy Ballon; Janice J. Banderas; Pedro Banderas; Peter Banderas; Victor Banderas; Monica Diaz; Anthony Forrester; Dustin Forrester; Johanna Forrester; Sarah Forrester; Ernest Gomez; Henrietta Gomez; Kathleen M. Gomez; Marcus G. (Minor); Lydia Green; Paul Anthony Green; Humberto R. Green; Mary Jo Hurtado; Justin A. Islas; Alexis L. (Minor); Cynthia Ledesma; Destiny C. Ledesma; Jesse L. (Minor); Isabelle M. Sepeda; Lupe Sepeda; Deborah L. Vargas; Desiree Vargas; Jeremiah Vargas; Jessiah Vargas; Terry Weight; Roland Alto, Sr.; Roland Alto, Jr.; Amanda Minges; David Brokiewicz; Diana Brokiewicz; Patricia Brokiewicz; Jason Alto; Carol Edith Cavazos; Aimee R. Diaz; Jessica Diaz; Toni Diaz; Daniel Gomez; Lisa Huntoon; Christine Martinez; Donelle Martinez; Justine Martinez; Marlene Martinez; Sabrina Martinez; and Cassandra Sepeda.

[3] Some documents included in the administrative record have multiple sets of page numbers. One set appears to be original numbering for the record submitted to the Assistant Secretary. Those numbers appear in the form of ALTO-2012-0001137, for example, which is the first page of the Assistant Secretary's January 28, 2011 Decision ("2011 Decision"). Despite the presence of the other number sets, the parties' briefs appear to use this original numbering.  The Court will do the same. Accordingly, references to the administrative record will be designated with the prefix "AR" followed by the appropriate Bates-stamped page number.  Applied to the example above, a reference to the first page of the Assistant Secretary's 2011 Decision will read "AR 1137."

*Wheeler*, 435 U.S. at 323. "[T]ribes are subject to plenary control by Congress," but they also remain "separate sovereigns pre-existing the Constitution." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978); *see United States v. Lara*, 541 U.S. 193, 200 (2004). "Thus, unless and 'until Congress acts, the tribes retain' their historic sovereign authority." *Michigan v. Bay Mills Indian Cmty.*, — U.S. —, 134 S. Ct. 2024, 2030 (2014) (citing *Wheeler*, 435 U.S. at 323).

"As part of their residual sovereignty, tribes retain power to legislate and to tax activities on the reservation, including certain activities by nonmembers, to determine tribal membership, and to regulate domestic relations among members." *Plains Commerce Bank*, 554 U.S. at 327 (citations omitted). "An Indian tribe has the power to define membership as it chooses, subject to the plenary power of Congress." *Williams v. Gover*, 490 F.3d 785, 789 (9th Cir. 2007). "A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community." *Santa Clara Pueblo*, 436 U.S. at 72 n.32.

### A.   The San Pasqual Band's Organization[4]

Following a tumultuous history with white settlers dating back to the 1850s, "[i]n 1954 the descendants of the San Pasqual Band realized that they would lose . . . [a] small piece of mislocated reservation land unless they organized to reclaim the reservation" that was initially created by President Ulysses S. Grant's executive order in 1870. (AR 1138-39.) "The Indians were required by the [Bureau of Indian Affairs] to develop proof of their descent from the original San Pasqual members." (AR 1139.)

On July 29, 1959, the Department of the Interior published a notice of Proposed Rulemaking, setting out regulations intended to "govern the preparation of a roll of the San Pasqual Band of Mission Indians in California." (AR 1139.) The final rule was

---

[4] The background describing the San Pasqual Band's organization is taken almost exclusively from the Assistant Secretary's 2011 Decision. (AR 1137-56.) A timeline of the Band's history is also included in the administrative record. (*See* AR 2092-94; *see also* AR 2060-67.) The Band's organizational history is not in dispute in this action.

codified at 25 C.F.R. Part 48, published March 2, 1960. (*Id.*) *See also* 25 Fed. Reg. 1829 (Mar. 2, 1960) (codified at 25 C.F.R. pt. 48). These regulations "directed that a person who was alive on January 1, 1959, qualified for membership in the band if that person was named as a member of the Band on the 1910 San Pasqual census, or descended from a person on the 1910 census and possessed at least 1/8 blood of the band, or was able to furnish proof that he or she was 1/8 or more blood of the Band." (AR 1140.)

Under the regulations promulgated in Part 48, an Enrollment Committee ("EC") was formed, "consisting of three primary and two alternate members, all of whom were shown on a 1910 Bureau of Indian Affairs (BIA) census of San Pasqual Indians." (AR 1140.) The regulations provided application and review procedures for any individuals interested in applying for membership in the San Pasqual Band. (*Id.*) Though the BIA's Field Representative accepted the applications, the Enrollment Committee reviewed applications and made recommendations that ultimately ended up with the Area Director. (*Id.*) "The Director was authorized by the Regulations to determine whether a person is qualified for membership." (*Id.*) Any appeals would then go to the Commissioner and the Secretary of the Interior. (*Id.*) "Thus, under the regulations, the authority to issue a final decision respecting membership in the Band was vested in officials in the Department of the Interior."[5] (*Id.*) The implementation of the regulations resulted in the creation of a membership roll for the San Pasqual Band in 1966. (*Id.*)

In November 1970, the Band voted on its Constitution, which was subsequently approved by the AS-IA in January 1971. (AR 1140; *see also* AR 1599-1600.) Article III of the San Pasqual Band's Constitution provided the following:

//

//

---

[5] Several of the titles in the Department of the Interior have since changed names: the BIA's Field Representative is equivalent to today's Agency Superintendent; the Area Director is now known as the Regional Director; and the Commissioner is now known as the Director of the BIA. (AR 1140.)

11cv2276

> Section 1.  Membership shall consist of those living persons whose names appear on the approved Roll of October 5, 1966, according to Title 25, Code of Federal Regulations, Part 48.1 through 48.15.
>
> Sec[tion] 2.  All membership in the band shall be approved according to the Code of Federal Regulations, Title 25, Part 48.1 through 48.15 and an enrollment ordinance which shall be approved by the Secretary of the Interior.

(AR 1591; *see also* AR 1140.)  "The plain language of the Band's Constitution incorporates the Part 48 regulations as published in 1960 as the controlling law of the Band."  (AR 1141; *see also* AR 1591.)

In November 1983, the United States Claims Court issued an award to the San Pasqual Band in a compromise settlement.  (AR 1141.)  Funds were subsequently appropriated by Congress to satisfy the award.  (*Id.*)

In 1987, the regulations were rewritten to assist in the distribution of the judgment funds by bringing the membership roll current.  (AR 1141, 1573-77.)  The final rule was codified in 25 C.F.R. Part 76, published August 20, 1987.  52 Fed. Reg. 31391 (Aug. 20, 1987) (codified at 25 C.F.R. pt. 76).  The revised regulations, Part 76, which became effective September 1987, included the following summary description:

> In accordance with a judgment plan . . . prepared pursuant to the Indian Judgment Funds Distribution Act, as amended, a portion of the judgment funds is to be distributed on a per capita basis to all tribal members living on April 27, 1985. The revision to the regulations will provide procedures, including a deadline for filing applications, to govern the preparation of a membership roll of the San Pasqual Band as of April 27, 1985, which will serve as the basis for the per capita distribution of judgment funds.

(AR 1573.)  This revision was later removed in June 1996 because "[t]he purpose for which these rules were promulgated has been fulfilled and the rules are no longer required."  61 Fed. Reg. 27780 (June 3, 1996).  "Members of the San Pasqual Band have been enrolled as required in satisfaction of the judgments of the United States Claims Court docket 80-A."  *Id.*

//

//

### B.     Marcus Alto, Sr. and His Descendants' Enrollment

Plaintiffs are descendants of Marcus R. Alto, Sr.  Neither Marcus Alto, Sr. nor his descendants were included on the 1966 membership roll.  (AR 1140.)  But on November 15, 1987, he and several of his descendants did apply for enrollment under the 1987 regulations.  (AR 1141.)  "His descendants claim[ed] to be eligible for enrollment in the Band based on the alleged biological link that Marcus Sr. provides to Maria Duro Alto and Jose Alto[.]"  (*Id.*)  Maria Duro Alto[6] and Jose Alto are identified as Marcus Alto, Sr.'s parents, and it is uncontested that both parents were full-blood members of the Band.  (AR 1141-42, 1516-18.)

Marcus Alto, Sr. died on June 16, 1988, before his enrollment application had been decided.  (AR 1141, 1516-18.)  However, the BIA continued processing his descendants' applications, and in May 1991, the BIA Superintendent notified the EC of his determination that Marcus Alto, Sr.'s descendants were eligible for enrollment in the San Pasqual Band.  (AR 1141.)  The Band challenged that determination in favor of Marcus Alto, Sr.'s descendants, which was ultimately appealed to the Assistant Secretary – Indian Affairs, who at the time was Ada E. Deer.  (*Id.*; *see also* AR 752-54.)

On April 10, 1995, in a final decision ("1995 Decision") from the Department of the Interior, the Assistant Secretary affirmed the Regional Director's finding from January 1994 that Marcus Alto, Sr. was full-blooded Diegueño Indian, upheld the enrollment of Marcus Alto, Sr. and his descendants, and found that they are eligible for inclusion on the Band's distribution roll.  (AR 1141-42, 1516-18.)

//

//

//

//

---

[6] Maria Alto's maiden name is Maria Duro.  Throughout the administrative record, she is referred to as Maria Alto, Maria Duro Alto, and Maria Duro.  The three names are used interchangeably to refer to Marcus Alto, Sr.'s mother.

### C.   The Assistant Secretary's 2011 Decision

A little over a decade later, Marcus Alto, Sr. and his descendants' enrollment status once again came to the forefront.  In 2007, Marcus Alto, Sr.'s descendants' qualification for enrollment was challenged, supported with purportedly new evidence. (AR 1142.)  The EC reopened the matter of Marcus Alto, Sr.'s ancestry, and Marcus Alto, Sr.'s descendants were provided with an opportunity to rebut the new evidence. (*Id.*)  Relying on the 1960 regulations permitting disenrollment when the decision to enroll was based on information "subsequently determined to be inaccurate," the EC proposed a revised membership roll to the BIA based on "new evidence provid[ing] substantial and convincing proof that Marcus R. Alto, Sr. [was] not the biological son of Maria Duro Alto, and that information provided on the 1987 membership application . . . was inaccurate and incomplete."  (AR 1142, 2010-11, 2013.)

On November 26, 2008, the Regional Director rejected the EC's recommendation to approve the disenrollment of Marcus Alto, Sr.'s descendants. (AR 1466-74.)  In a ten-page written decision, the Regional Director concluded that the information submitted by the EC "does not demonstrate the BIA's prior enrollment determination [in 1995] is inaccurate, and therefore does not support deletion of Mr. [Marcus] Alto from the Band's membership roll."  (AR 1466.)  But like the proceedings leading to the 1995 Decision, this challenge was ultimately appealed to the Assistant Secretary – Indian Affairs, who at the time was Larry Echo Hawk.  (*See* AR 1137-58.)

On January 28, 2011, the Assistant Secretary issued his twenty-page decision reversing the Regional Director's decision.  (AR 1137-56.)  To reach his conclusion, the Assistant Secretary identified six "key disputed facts" that first needed to be resolved:

//

//

//

11cv2276

> 1. Whether the 1907 baptismal certificate for "Roberto Marco Alto" is that of Marcus Alto, Sr.  A key subpart of this determination is assessing whether Marcus Alto was born in 1905, 1907, or some other year.
>
> 2. Whether Marcus Alto's failure to declare whether or not he was adopted on his application for enrollment in the Band, dated November 15, 1987, is persuasive evidence.
>
> 3. Whether Maria Duro Alto's statement that she had "no issue" (on her application for inclusion on the 1933 Roll of California Indians) is persuasive evidence.
>
> 4. Whether the non-inclusion of Marcus Alto's name on the early San Pasqual censuses is persuasive evidence.
>
> 5. Whether testimonial evidence in the record is persuasive evidence.
>
> 6. Whether DNA testimony submitted by Alto descendants is persuasive evidence.

(AR 1147.)

Before reaching his conclusion, the Assistant Secretary recognized "[t]here was universal acceptance of the fact that Marcus Alto, Sr., was raised from infancy by Jose Alto and Maria Duro Alto." (AR 1155.)  It was also emphasized that "[m]uch of the record evidence [was] conflicting, incomplete, or demonstrably inaccurate[,]" and that "[t]he record itself lack[ed] the most vital documents, including particularly a birth certificate for Marcus Alto." (*Id.*)  Despite that, the Assistant Secretary found that "fair interpretation of the most probative, objective, and competent evidence available amply supports the Enrollment Committee's recommendation to disenroll the Alto descendants." (*Id.*)  Particular emphasis was given to:

> Marcus Alto's absence from the early San Pasqual Indian censuses that showed Jose and Maria Alto; the competent testimony of tribal elders, family friends, and Dr. Shipek; and the facts set out in the 1907 baptismal certificate as corroborated by testimony in the affidavits. [And] the evidence relied upon by the Alto descendants [was] either self-reported by Marcus Alto, Sr.,—who cannot provide a first-hand account of his birth and parentage—or, in the case of information on Marcus Alto's application for inclusion on the 1933 Roll of California Indians, supplied by people with no obvious or inferable knowledge of Marcus Alto's parentage.

//

(AR 1155-56.)  Based on the evidence available at the time and by a preponderance of the evidence, the Assistant Secretary reversed the Regional Director's decision and determined that Marcus Alto, Sr.'s descendants' "names must be deleted from the Band's roll."[7]  (AR 1156.)

### D.    Procedural History of This Action

On September 9, 2011, Plaintiffs filed this complaint seeking, among other things, judicial review of the Assistant Secretary's 2011 Decision under the APA and the arbitrary-and-capricious standard.  Defendants answered.

Shortly after this action began, the Court granted Plaintiffs' motion for a preliminary injunction, restraining and enjoining Defendants from removing Plaintiffs from the San Pasqual Band's membership roll and from taking any further action to implement the Assistant Secretary's 2011 Decision for the duration of this lawsuit. (ECF No. 24.)  The Court also enjoined the Assistant Secretary from issuing certain interim orders.  (*Id.*)

On March 13, 2012, the complaint was amended upon receiving leave from the Court.  (ECF No. 50.)  In the FAC, Plaintiffs assert five claims to set aside the Assistant Secretary's 2011 Decision: (1) declaratory relief based upon the doctrine of res judicata; (2) declaratory relief on the basis that Defendant Echo Hawk violated the enrolled Plaintiffs' right to procedural due process; (3) declaratory relief and reversal of the 2011 Decision based upon the arbitrary-and-capricious standard; (4) "federal agency action unlawfully withheld and request for preliminary injunctive relief"; and (5) "declaratory and injunctive relief by all Plaintiffs against all Defendants[.]"[8]

---

[7] Interestingly, the Assistant Secretary left open the possibility of revisiting Marcus Alto, Sr.'s enrollment status in the future yet again because "evidence may come to light in the future that could overturn the reasoning set out [in the 2011 Decision]."  (AR 1156.)  For example, "[u]ncovering Marcus Alto, Sr.'s[] birth certificate, or conducting more thorough and accurate genetic testing, may prove the biological connection claimed by the Alto descendants."  (*Id.*)

[8] Plaintiffs have since abandoned their second claim for procedural-due-process violations. (*See* Pls.' Reply 1:10–13.)

1  Defendants answered the FAC.

2      After the Court granted the San Pasqual Band the limited right to intervene, the

3  Band pursued an interlocutory appeal to the Ninth Circuit. The Ninth Circuit affirmed

4  this Court's determination that it had jurisdiction to review the Assistant Secretary's

5  disenrollment decision and that the San Pasqual Band is not an indispensable party.

6  *Alto v. Black*, 738 F.3d 1111, 1131 (9th Cir. 2013). The Ninth Circuit also remanded

7  to "allow the district court formally to clarify the original injunction to conform with

8  the [Ninth Circuit's] understanding of the injunction," which was eventually resolved

9  by the parties. *Id.*

10      Now pending before the Court are the parties' cross-motions for summary

11  judgment.[9] (ECF Nos. 103, 110.) The administrative record was lodged with the Clerk

12  of the Court. (ECF No. 51.) Following briefing, the parties appeared for oral argument

13  on September 21, 2015.

14

15  **II.    STANDARD OF REVIEW**

16      Summary judgment is proper if the pleadings, discovery, and affidavits show that

17  there is "no genuine dispute as to any material fact and [that] the movant is entitled to

18  judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477

19  U.S. 317, 322 (1986). Summary judgment is a particularly appropriate tool for

20  resolving claims challenging agency action. *See Occidental Eng'g Co. v. INS*, 753 F.2d

21  766, 770 (9th Cir. 1985). As the administrative record constitutes the entire factual

22  record in this case and there are no facts at issue between the parties, this matter is ripe

23  for summary judgment.

24      A final agency action is reviewable under 5 U.S.C. § 706 when "there is no other

25  adequate remedy in a court." 5 U.S.C. § 704. "Under the APA, [a court] will reverse

26  _____

27      [9] This action was originally assigned to the Honorable Irma E. Gonzalez. Upon Judge
Gonzalez's retirement, the case was transferred to the Honorable Michael M. Anello. In May 2014,

28  this case was then transferred to this Court.

11cv2276

an agency's action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or if its factual findings are 'unsupported by substantial evidence.'" *Love Korean Church v. Chertoff*, 549 F.3d 749, 754 (9th Cir. 2008) (internal citations and quotation marks omitted); *see* 5 U.S.C. § 706(2)(A), (E). Review under this standard is "searching and careful," but also "narrow." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989). "Although [the court's] inquiry must be thorough, the standard of review is highly deferential; the agency's decision is 'entitled to a presumption of regularity,' and [the court] may not substitute [its] own judgment for that of the agency." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971)).

An agency decision is arbitrary and capricious:

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfgs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Hovhannisyan v. U.S. Dep't of Homeland Sec.*, 624 F. Supp. 2d 1135, 1149 (C.D. Cal. 2008) ("[A]n agency abuses its discretion when it fails to comply with [its own] regulations."). The agency must "cogently explain why it has exercised its discretion in a given manner," and the reviewing court must determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *State Farm*, 463 U.S. at 43.

Where the agency has relied on "relevant evidence [such that] a reasonable mind might accept as adequate to support a conclusion," its decision is supported by "substantial evidence." *Bear Lake Watch, Inc. v. Fed. Energy Regulatory Comm'n*, 324 F.3d 1071, 1076 (9th Cir. 2003). Even "[i]f the evidence is susceptible of more than one rational interpretation, [the court] must uphold [the agency's] findings." *Id.* A court must also "uphold a decision of less than ideal clarity if the agency's path may

reasonably be discerned . . . [but] may not infer an agency's reasoning from mere silence." *Arlington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008). The burden is on the plaintiffs to show any decision or action was arbitrary and capricious. *See Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

## III.  DISCUSSION[10]

Plaintiffs' challenge to the Assistant Secretary's 2011 Decision can be divided into two categories. The first is a purely legal challenge, arguing that the Assistant Secretary's prior determination in the 1995 Decision precludes the conclusion in the 2011 Decision under the doctrines of claim and issue preclusion.[11] The second attacks factual determinations made by the Assistant Secretary in the 2011 Decision. In the latter category, Plaintiffs argue that the Assistant Secretary's findings are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. The gist of Defendants' response is that the Assistant Secretary's 2011 Decision was reasonable and, as a result, should be affirmed by this Court.

The Court will address each issue raised by the parties below.

//

//

//

---

[10] Plaintiffs request that the Court take judicial notice of: (1) a page from the 1930 U.S. census for Marcus Alto, Sr.; (2) the San Diego County Death Certificate for Francisco Alto, Jr.; and (3) statements by Connie Alto (Pls.' Reply 5:12–22). In requesting judicial notice, Plaintiffs attempt to add evidence to the record. The Court agrees with Defendants that Plaintiffs attempt to improperly introduce extra-record evidence to challenge the "correctness or wisdom of the agency's decision." *See San Luis & Delta-Mendota*, 747 F.3d at 602. The Court also remains unconvinced that the aforementioned materials are "*necessary* to determine if the agency has considered all factors and explained its decision." *See Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010) (emphasis added). Therefore, the Court **DENIES** Plaintiffs' request for judicial notice. However, even if the Court considered these documents, it would ultimately have no effect on the conclusion of this order.

[11] The Court will refer to res judicata as claim preclusion and collateral estoppel as issue preclusion. *See Gonzalez v. Cal. Dep't of Corrections*, 739 F.3d 1226, 1230 n.3 (9th Cir. 2014).

### A.    Preclusion[12]

Plaintiffs argue that 1995 Decision concluding that Marcus Alto, Sr. was full-blooded Diegueño Indian, among other things, precludes re-litigation of his blood quantum.   Defendants contend that neither principle bars reevaluation of prior enrollment decisions.  The Court agrees with Defendants.

Claim preclusion "forecloses successive litigation on the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *Gonzalez*, 739 F.3d at 1230 n.3 (internal quotation marks omitted).  In other words, once rendered, judgment is treated "as the full measure of relief to be accorded between the parties on the same 'claim' or 'cause of action.'" *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 887 (9th Cir. 2000).  An action is barred under claim preclusion where "(1) the prior litigation involved the same parties or privies, (2) the prior litigation was terminated by a final judgment on the merits, and (3) the prior litigation involved the same 'claim' or 'cause of action' as the later suit." *Id.* at 888.

Issue preclusion "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Gonzalez*, 739 F.3d at 1230 n.3 (internal quotation marks omitted).  It applies where "(1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be

---

[12] The Assistant Secretary did not address preclusion in the 2011 Decision.  As a result, application of preclusion principles is not reviewed under the APA's arbitrary-and-capricious standard. The parties do, however, both appear to implicitly agree that preclusion is an issue properly before the Court.  *Cf. Aguayo v. Jewell*, No. 13-cv-1435, 2014 WL 6473111, at *17 (S.D. Cal. Nov. 18, 2014) (preclusion arguments were first presented to the Department of the Interior before review by the district court in a disenrollment context).  The Court's independent research suggests the same.  *See Canonsberg Gen. Hosp. v. Sebelius*, 989 F. Supp. 2d 8, 27 n.15 (D.D.C. 2013) (citing *Barlow v. Collins*, 397 U.S. 159, 166 (1970) ("The rule of the courts should, in particular, be viewed hospitably where . . . the question sought to be reviewed does not significantly engage the agency's expertise."); *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n*, 707 F.2d 1485, 1489 (D.C. Cir. 1983) (holding that administrative exhaustion was not required where issue was strictly legal, "[n]o factual development or application of agency expertise [would] aid the court's decision," a decision by the court would not "invade the field of agency expertise or discretion," and controversy "presents issues on which courts and not administrators are more expert" when the only dispute relates to the meaning of a statutory term)).

relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding." *Hydranautics*, 204 F.3d at 885. "The party asserting preclusion bears the burden of showing with clarity and certainty what was determined by the prior judgment." *Id.*

In *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 421-22 (1966), the Supreme Court removed any doubt that preclusion principles may apply to administrative proceedings. Preclusion particularly applies in circumstances "[w]hen an administrative agency is acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate." *Utah Constr.*, 384 U.S. at 422. Since *Utah Construction*, "courts have increasingly given res judicata and collateral estoppel effect to the determinations of administrative agencies acting in a judicial capacity." *United States v. Lasky*, 600 F.2d 765, 768 (9th Cir. 1979).

"Despite this general acceptance, the doctrines are not to be applied to administrative decisions with the same rigidity as their judicial counterpart." *Lasky*, 600 F.2d at 768 (citing *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 10 (5th Cir. 1974); *United States v. Smith*, 482 F.2d 1120, 1123 (8th Cir. 1973)); *see also Valencia-Alvarez v. Gonzalez*, 469 F.3d 1319, 1324 n.7 (9th Cir. 2006) ("[I]n the administrative law context, 'the principles of collateral estoppel and res judicata are applied flexibly.'"). "This is particularly true where their application would contravene an overriding public policy." *Lasky*, 600 F.2d at 768 (citing *Tipler v. E.I. du Pont de Nemours & Co.*, 443 F.2d 125, 128 (6th Cir. 1971)). Consequently, "the need to proceed cautiously in this area is acute, and due regard must be given in each case as to whether the application of the doctrine is appropriate in light of the particular prior administrative proceedings." *Id.*

//

//

## 1.      Application of Preclusion Principles

When comparing the 1995 Decision and 2011 Decision, it is easy to jump to the conclusion that preclusion principles apply—Marcus Alto, Sr.'s blood degree was a factual issue previously litigated to its conclusion in the 1995 Decision, and it is at issue here once again.  *See Hydranautics*, 204 F.3d at 885, 888.  But that is an oversimplification of the factual and legal cogs at work.  Though the 1995 Decision and 2011 Decision addressed arguably the same factual issue regarding Marcus Alto, Sr.'s blood degree to contradicting conclusions, it is important to consider that the legal foundations to reach those respective conclusions are quite different.

In the 1995 Decision, AS-IA Ada E. Deer found that Marcus Alto, Sr. "possessed 4/4 Indian blood of the Band" in upholding his and his descendants' enrollment and finding that "they are eligible for inclusion on the Band's Docket 80-A distribution roll."  (AR 1518.)  To reach that conclusion, AS-IA Ada E. Deer relied on the regulatory framework in 25 C.F.R. Part 76 (1987), 52 Fed. Reg. at 31392-93, a regulation implemented in order to distribute certain judgment funds issued as an award in a compromise settlement with the San Pasqual Band.  (AR 1141.)  Section 76.4 of the 1987 regulations provides the enrollment requirements relied upon in the 1995 Decision.  (AR 1516.)

The regulatory framework supporting the 2011 Decision is quite different.  AS-IA Larry Echo Hawk relied on the regulatory framework in 25 C.F.R. Part 48 (1960), 29 Fed. Reg. at 1831, which was also adopted by the San Pasqual Band through its Constitution.  (AR 1142.)  Section 48.14(d) of the 1960 regulations requires that the membership roll be kept current by deleting "[n]ames of individuals whose enrollment was based on information subsequently determined to be inaccurate . . . subject to the approval of the Secretary."  29 Fed. Reg. at 1831.  That is the authority that AS-IA Larry Echo Hawk explicitly invoked in reaching his conclusion in the 2011 Decision that "the enrollment of the Marcus Alto, Sr.[] descendants was based on information subsequently determined to be inaccurate, and as a result, their names must be deleted

from the Band's roll."  (AR 1142, 1156.)

The two agency decisions relied on fundamentally different regulations permitting their respective actions: Part 76, which was later removed, permitted the Assistant Secretary to review new applications for enrollment; and Part 48 permitted and continues to permit the Assistant Secretary keep the Band's membership rolls accurate and current.  *See* 52 Fed. Reg. at 31392-93; 29 Fed. Reg. at 1831.  These circumstances call for the "flexible" application of preclusion principles to the administrative agency decision currently before this Court. *See Valencia-Alvarez*, 469 F.3d at 1324 n.7.  Proceeding more cautiously, it is apparent that though the 1995 Decision and 2011 Decision address a similar factual issue, the conclusions are very different in nature.  The 1995 Decision relied on the now-defunct 1987 regulations permitting enrollment in order to distribute certain settlement funds while the 2011 Decision relied on the still-operative 1960 regulations and the Band's Constitution permitting reevaluation of membership status under certain circumstances. This critical difference compels this Court to conclude that application of preclusion principles is not appropriate upon reviewing the two administrative proceedings with closer scrutiny.  *See Lasky*, 600 F.2d at 768.

## 2.    Policy Considerations

Overriding policy considerations relevant to this case also support the determination that applying preclusion principles would be inappropriate. *See Lasky*, 600 F.2d at 768.  There are at least two applicable policies that warrant consideration: (1) "[a] tribe's right to define its own membership for tribal purposes"; and (2) "federal policy favoring tribal self-government[.]"  *See Alto*, 738 F.3d at 1115 (citing *Cahto Tribe of Laytonville Rancheria v. Dutschke*, 715 F.3d 1225, 1226 (9th Cir. 2013); *Lewis v. Norton*, 424 F.3d 959, 961 (9th Cir. 2005)).  Though the San Pasqual Band vested ultimate authority over membership decisions to the Department of the Interior when its Constitution was adopted, that does not minimize a tribe's conscious decision

to incorporate language from certain federal regulations. *See id.*

In 1970, presumably contemplating the full impact of § 48.14 of the 1960 regulations as the vehicle for keeping its membership roll current, the San Pasqual Band voted and approved its Constitution incorporating the still-operative provisions of Part 48. (AR 1141, 1591.) From that, it is easy to infer that the Band fully intended to keep its membership roll current and accurate under the provisions of Part 48. In other words, the San Pasqual Band defined its membership as not one that is absolute, but subject to review under certain circumstances, in part, to promote accuracy. That is further highlighted by the fact that Part 76 is now defunct after serving a specific purpose during a discrete time period.

Strictly applying preclusion principles to the circumstances of this case would negate both policies of a tribe's right to define its own membership and tribal self-government. By precluding the 2011 Decision as a result of the conclusion reached in the 1995 Decision, the Court would effectively nullify portions of Part 48 and the San Pasqual Band's Constitution that allows review of membership decisions based on information subsequently deemed to be inaccurate. It would also override federal policy favoring tribal self-government, which in this case is the San Pasqual Band's incorporation of Part 48 through the approval of its Constitution.

Keeping these policies in mind, this Court is not prepared to make a legal determination based on preclusion principles finding that the San Pasqual Band cannot review membership decisions when it explicitly contemplated that authority through the approval of its Constitution and adoption of Part 48. *See Alto*, 738 F.3d at 1115. To find otherwise would not only offend the San Pasqual Band's right to define its own membership, but also violate federal policy favoring tribal self-government. These policy considerations in conjunction with the fact that the two agency decisions are based on different regulations—one of which is now defunct, and the other which remains operative and incorporated into the Band's Constitution—compel this Court to find that strictly applying preclusion principles would be inappropriate. *See Lasky*,

600 F.2d at 768.

### B.    Challenges to the Assistant Secretary's Factual Determinations

"Under the APA, [a court] will reverse an agency's action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or if its factual findings are 'unsupported by substantial evidence.'" *Love Korean Church*, 549 F.3d at 754 (internal citations and quotation marks omitted); *see* 5 U.S.C. § 706(2)(A), (E).  The scope of the court's review under the APA is narrow, and a court may not substitute its own judgment for that of the agency.  *See San Luis & Delta-Mendota*, 747 F.3d at 601.

Agency decisions are examined to "ensure that it has articulated a rational relationship between its factual findings and its decision[.]"  *Fence Creek Cattle*, 602 F.3d at 1132.  The agency's factual determinations are entitled to substantial deference and should be upheld if they are supported by the administrative record.  *Arkansas v. Oklahoma*, 503 U.S. 91, 112 (1992); *see also Melkonian v. Ashcroft*, 320 F.3d 1061, 1065 (9th Cir. 2003) (noting that an agency's factual findings must be upheld "if supported by reasonable, substantial, and probative evidence in the record"); *Bonnichsen v. United States*, 367 F.3d 864, 880 n.19 (9th Cir. 2004) ("Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."); *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999) ("Substantial evidence is more than a scintilla but less than a preponderance.").  If the record supports more than one rational interpretation of the evidence, the court will defer to the agency's decision.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005).

The administrative record "consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's positions."  *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (emphasis in original).  "Agencies are not required to consider every alternative

proposed nor respond to every comment made.  Rather, an agency must consider only 'significant and viable' and 'obvious' alternatives." *Ron Peterson Firearms, LLC v. Jones*, 760 F.3d 1147, 1165 (10th Cir. 2014) (quoting *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 724 (5th Cir. 2013)) (internal quotation marks omitted).  A court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned[.]"  *Arlington*, 516 F.3d at 1112.

Plaintiffs challenge seven factual determinations that the Assistant Secretary relied upon to reach the conclusion to disenroll Marcus Alto, Sr.'s descendants.  Each challenge will be discussed below.  Though all of Plaintiffs' challenges are asserted under § 706(2)(A)'s arbitrary-and-capricious standard, the Court will also review these challenges under § 706(2)(E) for substantial evidence.

### 1.    Weight Given to the San Pasqual Censuses

Noting that "[t]he record includes BIA censuses of the San Pasqual Indians from 1907 through 1913, all of which include Jose Alto, Maria Duro, and Jose's son, Frank Alto," the Assistant Secretary found that "the absence of Marcus Alto, under any name, from these Indian censuses to be very weighty evidence that the couple who raised him did not consider him to be a San Pasqual Indian—which would be consistent with his being adopted."  (AR 1151.)  Plaintiffs argue that the weight given the San Pasqual censuses was arbitrary and an abuse of discretion for three reasons: (1) "the censuses as now acknowledged were inaccurate"; (2) the Assistant Secretary "failed to address the Band's hired anthropology expert's evidence"; and (3) "the 1920 U.S. census identifies Marcus Alto Sr. as Maria and Jose Alto's son, and the Alto family household is identified as 'Indian.'"  (Pls.' Mot. 12:1–17.)

To begin, there is no acknowledgment that the censuses are inaccurate.  This proposition appears to be rooted in a response in the answer where Defendants admit that the censuses "contain inaccuracies."  (*See* Answer ¶ 76.)  Censuses "contain[ing] inaccuracies" is very different from stating that the censuses are "inaccurate."  The

former is an assessment of the censuses' components whereas the latter is an assessment of the censuses as a whole. Plaintiffs fail to identify evidence suggesting that the censuses are inaccurate in their entirety.

In their reply, Plaintiffs elaborate that the "censuses are inherently flawed" because "Jose Alto was reported the same age, age 50, on the 1907, 1908 and 1910 censuses." (Pls.' Reply 4:1–5.) Now it may be fair to conclude that the censuses are inherently flawed for the purposes of determining a member's age, particularly Jose Alto's. However, Plaintiffs fail to persuade the Court that that "flaw" permeates to other aspects of the censuses, such as the Band's members at the time of the censuses were conducted.

Reviewing the censuses from 1907 through 1912, though there are inconsistencies in some members' ages, there are none identified with respect to the composition of Jose and Maria Alto's nuclear family. The 1907 census indicates that the family consisted of Jose Alto, Maria Alto, and Frank Alto; Marcus Alto, Sr. is not listed even though he was allegedly born in 1905.[13] (AR 2576.) The same family members are listed in each census from 1908 through 1913 indicating Jose Alto as husband, Maria Alto as wife, and Frank Alto as son, but without any mention of Marcus Alto, Sr. (AR 2581, 2541, 2597, 2602, 2605, 2376.) Despite likely inaccuracies regarding members' ages existing throughout these censuses, the censuses are nonetheless incredibly consist with respect to the family consisting of Jose Alto, Maria Alto, and Frank Alto without any mention of Marcus Alto, Sr. Any inaccuracies regarding age do not negate the entirety of each census from 1907 through 1912, including the cornerstone of lineal descendancy for the San Pasqual Band, the 1910 census.

---

[13] Like several other facts in this case, Marcus Alto, Sr.'s birth year remains a point of contention. Plaintiffs take the position that he was born in 1905. (FAC ¶ 82.) Based on that allegation, Plaintiffs must admit that Marcus Alto, Sr. was alive at the time each census was conducted from 1907 through 1912.

The consistency throughout these censuses is also significant.  Repeatedly, throughout a span of seven years, Jose and Maria Alto had the opportunity to identify their progeny, and they did, repeatedly identifying Frank Alto as their son.  If Marcus Alto, Sr. was indeed the biological child of Jose and Maria Alto, presumably he would have been treated the same as Frank Alto.  But he was not.  From that, the Assistant Secretary reached a reasonable and sound conclusion that Marcus Alto, Sr. was not Jose and Maria Alto's biological son.

In contrast to the seven censuses from 1907 through 1912, the 1920 U.S. census apparently indicates Marcus Alto, Sr. as "Indian" and the son of Jose and Maria Alto.[14] To reconcile the 1920 census with the censuses from 1907 through 1912, the Assistant Secretary found "the adoption theory to be the most logical explanation for the fact that Marcus Alto is not listed with his parents on the Indian censuses, but does appear on the Federal census of 1920." (AR 1151.)  The suggestion appears to be that sometime between the 1907-1912 censuses and the 1920 census, Jose and Maria Alto adopted Marcus Alto, Sr.  (*See id.*)  Another possibility is that Jose and Maria Alto treated the BIA censuses differently as relating specifically to tribe members compared to the 1920 U.S. census conducted by the federal government.  These possibilities are also consistent with the Assistant Secretary's conclusion.  Though less than ideal in clarity, the Assistant Secretary's "path may reasonably be discerned." *See Arlington*, 516 F.3d at 1112 (A court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned[.]").  Because this factual determination is supported by the administrative record, the determination and the decision will be given substantial deference. *See Arkansas*, 503 U.S. at 112; *Bayliss*, 427 F.3d at 1214 n.1.

//

---

[14] The Court reviewed the 1920 census documents submitted. (AR 1807, 1983.) It was unable to locate the precise text indicating Jose Alto, Maria Alto, Frank Alto, and Marcus Alto, Sr. due to the low quality of the document scanned, but will presume the names are present given that all parties agree that the names are indeed present in the 1920 census.

The last point Plaintiffs present is that the Assistant Secretary "failed to address the Band's hired anthropology expert's evidence." (Pls.' Mot. 12:1–8.) Specifically, Plaintiffs argue that the Assistant Secretary failed to consider information in the 121st footnote in an April 2010 report prepared by Christine Grabowski, Ph.D., which purportedly identifies "several children born to other San Pasqual tribal members, between 1897 and 1903, who were NOT identified on the San Pasqual censuses[.]" (*Id.*)

The footnote Plaintiffs identify appears in a portion of the report examining what certain individuals living in Riverside County in 1910 "knew about Marcus Alto's parentage." (AR 1047.)  The footnote is associated with the following paragraph:

> Carolina Benson's children by both Jose Castro and Augustin Orosco and their spouses appeared repeatedly in the baptismal records of the St. Francis de Sales Church. Not only did they have several children between all of them, but they served as sponsors for each other's offspring.

(AR 1048.)   The footnote itself provides examples of Carolina Benson's family members serving as sponsors for each other's offspring. (*Id.*)  There is no mention of who appeared or did not appear in relevant censuses.  At best, the portion of the report relevant to the footnote is an examination of the close ties between certain families reflected in baptismal records.  (*See id.*)  But more accurately, Plaintiffs grossly mischaracterize the footnote in the expert report, and the Assistant Secretary acted reasonably in not addressing it.  *See Ron Peterson Firearms*, 760 F.3d at 1165 (quoting *10 Ring Precision*, 722 F.3d at 724) (Agencies are not required to "consider every alternative proposed nor respond to every comment made.  Rather, an agency must consider only 'significant and viable' and 'obvious' alternatives.").

## 2.     Credibility of Certain Affidavits and Testimonial Evidence

In the 2011 Decision, the Assistant Secretary found that "the testimonial evidence contained in affidavits by tribal elders, tribal enrollment committee members, close acquaintances of Maria Duro Alto and Marcus Alto, and especially anthropologist

Florence Shipek, Ph.D., to be very credible and probative respecting Marcus's status as biological or adoptive son of Jose and Maria Duro Alto." (AR 1138.) The collection of affidavits considered by the Assistant Secretary included three affidavits from 1994 and six others from 2004. (AR 1150-51.) Focusing primarily on statements by Felix Quisquis, Mellie Duenas, Florence C. Shipek, Ph.D., and Helen Mendez, Plaintiffs appear to argue that the Assistant Secretary's reliance on testimonial evidence is arbitrary and capricious because it "contain[s] hearsay, lacks foundation and [is] contradicted by the Band's other evidence." (Pls.' Mot. 13:1–10.)

It is a "well-settled rule that agencies are not bound by strict rules of evidence in cases brought under the Administrative Procedure Act." *Villegas-Valenzuela v. Immigration & Naturalization Serv.*, 103 F.3d 805, 812 (9th Cir. 1996). Rather, "the Administrative Procedure Act provides that '[a]ny oral or documentary evidence may be received, but every agency shall as a matter of policy provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence.'" *Calhoun v. Bailar*, 626 F.2d 145, 148 (9th Cir. 1980) (quoting 5 U.S.C. § 556(d)). "A sanction may not be imposed or rule or order issued except on consideration of the whole record or those parts thereof cited by a party and supported by and in accordance with the reliable, probative, and substantial evidence." *Id.* (quoting 5 U.S.C. § 556(d)) (internal quotation marks omitted).

"[T]he classic exception to strict rules of evidence in the administrative context concerns hearsay evidence." *Calhoun*, 626 F.2d at 148. "Not only is there no administrative rule of automatic exclusion for hearsay evidence, but the only limit to the admissibility of hearsay evidence is that it bear satisfactorily indicia of reliability." *Id.* The test for admissibility requires "that the hearsay be probative and its use fundamentally fair." *Id.* "[I]t is not the hearsay nature per se of the proffered evidence that is significant, it is its probative value, reliability and the fairness of its use that are determinative." *Id.*

//

11cv2276

The Assistant Secretary noted that Dr. Shipek is "an anthropologist who worked closely with the Band in establishing its base roll" who "described her careful research into the ancestry of the San Pasqual Band, and her work with tribal elders." (AR 1150.) In her affidavit, Dr. Shipek noted, among other things, that she "met with all the band elders and each provided [her] with a written list of ancestors and children," "searched the records of San Diego Mission, St. Josephs [sic] Cathedral, and Holy Trinity Church for baptismal, marriage and death records of all persons having those names as written, or by other potential spellings (by pronunciation) and also by translations back into Kumeyaay names, or transliterations of the Kumeyaay names," and "examined San Pasqual Valley school records, the County tax assessor records, county birth, marriage and death records, voter registration records, country court records, and available written reminiscences." (AR 2195.) Dr. Shipek's research led her to the conclusion that Jose Alto and Maria Duro Alto "had no children but had raised one belonging to a non-Indian family." (AR 2195-96.) The thoroughness of Dr. Shipek's research strongly supports the Assistant Secretary's determination that her affidavit was probative, reliable, and fair to use. *See Calhoun*, 626 F.2d at 148.

It is worth reiterating that the Assistant Secretary found the affidavits "very credible and probative" as they related to Marcus Alto, Sr.'s "status as biological or adoptive son of Jose and Maria Duro Alto." (*See* AR 1138.) However, the credibility challenges to the remaining affidavits are mostly critical of affiant assertions that are not relevant to Marcus Alto, Sr.'s lineage. For example, Plaintiffs challenge Felix Quisquis' credibility on the basis that there was a discrepancy regarding his age (Pls.' Mot. 13:1–10), Mellie Duenas on the basis that there was a discrepancy regarding her address (Pls.' Mot. 13:11–18), and Mary Alto Arviso and Laura Guidry on the basis of their ancestry (Pls.' Mot. 13:19–14:13; Pls.' Reply 8:1–15). Though these considerations may weigh against finding a particular affidavit credible, they do not necessitate that conclusion. Rather, the fact finder—the Assistant Secretary in this case—weighs various considerations to determine credibility. With respect to these

remaining affidavits, given that these considerations Plaintiffs identify are not relevant to Marcus Alto, Sr.'s lineage, the Assistant Secretary acted reasonably in determining the affidavits were credible for the purpose of determining whether Marcus Alto, Sr. is the biological or adoptive son of Jose Alto and Maria Alto.

Plaintiffs also challenge statements that it was "common knowledge" Marcus Alto, Sr. was non-Indian in two ways: (1) those making statements asserting this "common knowledge" lacked personal knowledge and other foundational facts; and (2) "common knowledge" is not probative or reliable evidence.  With respect to the assertions regarding personal knowledge and foundation, Plaintiffs attempt to strictly apply the rules of evidence by invoking foundation requirements.  As discussed above, agencies are not bound by such a strict application of the rules of evidence for cases brought under the APA.  *See Villegas-Valenzuela*, 103 F.3d at 812.  Rather, the applicable standard is whether the evidence is irrelevant, immaterial, or unduly repetitious.  *See Calhoun*, 626 F.2d at 148.  Plaintiffs fail to demonstrate that the evidence identified making references to "common knowledge" is irrelevant, immaterial, or unduly repetitious.  *See id.*

Plaintiffs' assertion that "common knowledge" is not probative or reliable evidence sounds more in hearsay.  They explain that "[c]ommon knowledge can be based on a rumor that if repeated enough times can appear to be the truth[,]" and "[r]umor is proof of no fact."  (Pls.' Reply 7:5–19.)  This criticism appears to be directed at the nature of common knowledge being rooted in rumor, which in turn derives from repetition of the statement that Marcus Alto, Sr. was not "Indian" and adopted.  (*See id.*)  That *is* indeed hearsay.  But the test for admissibility in the administrative setting is whether the hearsay evidence is probative and its use is fundamentally fair.  *See Calhoun*, 626 F.2d at 148.  Plaintiffs fail to demonstrate that the affidavits making reference to common knowledge lack probative value or are not fundamentally fair.  *See id.*  If Plaintiffs did not mean for this challenge to sound in hearsay, the defective reasoning previously discussed remains—the criticisms directed

1    at these affidavits are simply not relevant to Marcus Alto, Sr.'s lineage.  (*See* Pls.'

2    Reply 7:5–19.)

3

### 3.    Weight of DNA Evidence

5    Plaintiffs make the following argument directed at the apparent disconnect

6    between the determination that Marcus Alto, Sr. is "non-Indian" and the DNA evidence

7    indicating Native American ancestry:

> The AS-IA acknowledged the affidavits gave credence to the
> "adoption theory" because they stated that Marcus Alto Sr.
> was "'Mexican, not Indian." The AS-IA found that many "of
> the affidavits note that Marcus Alto was <u>non-Indian</u> and the
> child of a different family <u>not just a different mother</u>."  As
> emphasized, these statements were entitled to no weight and
> certainly not "substantial weight."
>
> In finding the adoption theory probable, the AS-IA failed to
> give any weight to public record documents establishing that
> Marcus Alto Sr. publicly identified himself as "Indian" and
> DNA evidence that establishes that Raymond E. Alto has
> 30-percent Native American ancestry.

15   (Pls.' Mot. 15:8–18 (citations omitted) (emphasis in original).)   In response,

16   Defendants explain that "Plaintiffs[] mistakenly rely on DNA testing that shows a

17   descendant of the Alto family 'has 30-percent Native American ancestry,' possible only

18   if Marcus was a full-blood Indian as Plaintiffs theorize." (Defs.' Mot. 2716–28:5.)

19   The Assistant Secretary rejected Plaintiffs' argument that DNA markers

20   indicating Native-American ancestry supports a finding that Marcus Alto, Sr. was of

21   San Pasqual ancestry for two reasons. (AR 1155.) The first reason was that the "type

22   of genetic testing relied on . . . does not provide accurate data on the proportion of

23   Indian ancestry." (*Id.*) To support that reason, the Assistant Secretary cited to the

24   Office of Federal Acknowledgment's explanation that "[u]nlike blood degree

25   calculations, the proportion[s] of the DNA markers tracked in such ethnicity testing are

26   not passed to children with predictable mathematical precision[,]" such that "[t]he child

27   of a father with 50 percent 'Native American' markers and a mother with no 'Native

28   American' markers does not have 25 percent 'Native American' markers." (*Id.*) The

Assistant Secretary's second reason was that DNA results do not indicate whether the Native-American markers are the result from San Pasqual Indian lineage or another tribe. (*Id.*) These explanations adequately and reasonably addressed why the Assistant Secretary chose not to rely on DNA evidence.

Plaintiffs' challenge regarding the Assistant Secretary's failure to give any weight to documents establishing that Marcus Alto, Sr. *publicly identified himself* as "Indian" is not supported by the record. To support this proposition, Plaintiffs direct the Court's attention to several documents in the administrative record. (Pls.' Mot. 15:8–18 (citing AR 473, 487, 490, 1985, 2431, 2635).) The first document cited is the 1920 federal census, but this is not necessarily Marcus Alto, Sr. himself publicly identifying himself as "Indian." (AR 2431.) Even if the Assistant Secretary construed the 1920 federal census as Marcus Alto, Sr.'s self-identification that he is "Indian," the Assistant Secretary already reconciled the 1920 federal census with the earlier censuses finding that the consideration of all the censuses is consistent with the adoption theory. (*See* AR 1151.) Several of the other documents identified face similar defects in that they are not statements made directly from Marcus Alto, Sr. himself. (*See* AR 473, 487, 2431.)

There are, however, two documents—a marriage certificate and a social-security document—where Marcus Alto, Sr. indeed identified himself as "Indian." (AR 490, 2635.) In their reply, Plaintiffs characterize the value of these documents as a reliability issue. (Pls.' Reply 8:16–9:13.) They contend that the aforementioned documents, including the 1920 federal census, corroborate the two documents where Marcus Alto, Sr. self-identified himself as "Indian," thereby providing greater reliability. (*See id.*) Though Plaintiffs' point may have merit, courts "must defer to a reasonable agency action 'even if the administrative record contains evidence for and against its decision.'" *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010) (quoting *Trout Unlimited v. Lohn*, 559 F.3d 946, 958 (9th Cir. 2009)). There is ample evidence in the administrative record supporting the Assistant Secretary's

credibility determination, such as early census records and affidavits, among many others, and weight given to certain evidence to reach the conclusion that Marcus Alto, Sr. is not a San Pasqual lineal descendant.   From that, the Assistant Secretary's reasoning can be easily discerned linking his conclusion to the factual findings, and thus, the conclusion warrants deference. *See Arkansas*, 503 U.S. at 112; *Bayliss*, 427 F.3d at 1214 n.1; *Arlington*, 516 F.3d at 1112 (A court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned[.]").

### 4.   Weight Given to Maria Duro's "No Issue" Statement

Maria Duro Alto's enrollment application showed "no issue" in the space for providing information regarding the applicant's children.  (AR 1152.)   She also identified her husband as a full-blood Indian.  (*Id.*)   While considering the impact of Maria Alto's application, the Assistant Secretary noted "disturbing inconsistencies," but ultimately rejected the contention that the "no issue" statement lacked credibility. (AR 1152-53.)

Two reasons informed the Assistant Secretary's conclusion.  First, he determined that being able to neither *read nor write* did not establish whether Maria Alto *spoke and understood* English.  (AR 1153.)  Based on information contained in the 1920 federal census, the Assistant Secretary found Maria Alto indeed spoke English, suggesting that she understood the meaning of not only the question regarding her children in the application but also her "no issue" response.  (*Id.*)  And second, under the premise that "the distinction between 'child,' which term applies to both biological and adopted children, and 'issue,' which does not, is a matter of great importance to all parents[,]" the Assistant Secretary determined that "Maria Duro Alto would pay scrupulous attention to that distinction is perfectly consistent with the theory that she adopted Marcus Alto and was careful not to identify a 'child' who did not qualify as an Indian."  (*Id.*)   Based on these determinations, Maria Alto understood the importance of the application question and her answer.  (*See id.*)  Accordingly, the

Assistant Secretary concluded that "Maria Duro's application contains a statement that precludes Marcus Alto from being Maria Duro's biological son, sworn by two witnesses." (*Id.*)

Plaintiffs challenge this finding on the grounds that the issue was "already addressed, considered and rejected in the April 10, 1995 decision[,]" and the existence of conflicting evidence. (Pls.' Mot. 15:23–16:13; Pls.' Reply 10:9–18.)  The former is essentially a preclusion argument, which the Court already rejected above.  More importantly, it grossly misstates what was determined in the 1995 Decision.  As Defendants accurately point out, the "no issue" statement is not mentioned anywhere in the 1995 Decision, and as a consequence, was not an factor rejected or even considered in the 1995 Decision. (*See* AR 1516-18.)

The latter challenges the Assistant Secretary's ability to weigh evidence and make credibility determinations.  However, the existence of conflicting evidence alone does not categorically negate the value of other evidence.  It is worth repeating that the administrative record "consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's positions." *Thompson*, 885 F.2d at 555 (emphasis in original). And "[a]gencies are not required to consider every alternative proposed nor respond to every comment made." *Ron Peterson Firearms*, 760 F.3d at 1165.  Courts "must defer to a reasonable agency action 'even if the administrative record contains evidence for and against its decision.'" *Modesto Irrigation*, 619 F.3d at 1036 (quoting *Trout Unlimited*, 559 F.3d at 958).

What is important is not the existence of conflicting evidence, but rather the existence of evidence supporting the agency's reasoning. *See Modesto Irrigation*, 619 F.3d at 1036; *Arlington*, 516 F.3d at 1112.  That said, the Assistant Secretary addressed the fact that there is conflicting evidence in the administrative record and thoroughly explained his reasoning to reach the determination that Maria Alto's "no issue" statement in her enrollment application was credible. (*See* AR 1153.)  This is not a

situation where a determination was less than ideal in clarity.  *See Arlington*, 516 F.3d at 1112.  There is clear evidence that rationally and reasonably connects the evidence in the administrative record to the Assistant Secretary's finding.  *See id.*

### 5.    Marcus Alto, Sr.'s Birth Year

Recognizing that the "record is quite conflicted as to the year of Marcus Alto's birth," the Assistant Secretary identified several documents that may assist in determining Marcus Alto, Sr.'s birth year.  (AR 1148-49.)  Documents considered included San Pasqual membership-roll records, social-security records, documents filled out by Marcus Alto, Sr., the birth certificate of one of Marcus Alto, Sr.'s children, and Marcus Alto, Sr.'s marriage certificate, among others.  (*Id.*)  Reiterating that "there seems to be little certainty respecting the year in which Marcus Alto, Sr., was born," the Assistant Secretary found that Marcus Alto, Sr. was born in 1907.  (AR 1149.)  The Assistant Secretary explained that any claims to have been born in different years was "rationally explained as reflecting his desire to hide the fact he was under-aged at the time of his marriage."  (*Id.*)

Plaintiffs argue that the Assistant Secretary's conclusion regarding Marcus Alto, Sr.'s birth year is arbitrary and capricious because he ignored evidence, improperly gave weight to others, and failed to explain why certain evidence "had no relevance." (Pls.' Mot. 16:17–17:24.)

Plaintiffs fail to provide any legal authority requiring the Assistant Secretary to specifically identify *every* issue or *every* fact raised by the parties.  More importantly, the Court already rejected this line of reasoning, most recently in discussing the weight given to Maria Duro's "no issue" statement.

In reaching the conclusion that Marcus Alto, Sr. was born in 1907, perhaps the Assistant Secretary did not explain every nuance in his reasoning to a level satisfying Plaintiffs.  But that is not the applicable standard.  The evidence that Plaintiffs identify is part of the administrative record, and as such, it is presumed to have been

considered—directly or indirectly—by the Assistant Secretary.  *See Thompson*, 885 F.2d at 555.  At worst, the lack of a *specific* explanation addressing the evidence identified by Plaintiffs is a finding that has "less than ideal clarity."  *See Arlington*, 516 F.3d at 1112.

What is important is not the existence of conflicting evidence, but rather the existence of evidence supporting the agency's reasoning.  *See Modesto Irrigation*, 619 F.3d at 1036; *Arlington*, 516 F.3d at 1112.  The Assistant Secretary provided a more than adequate explanation of his reasoning, referencing documents that corroborate his conclusion while also addressing the other possible birth years.  (*See* AR 1148-49.)  Like the finding regarding Maria Duro's "no issue" statement, this is not a situation where a determination was less than ideal in clarity.  *See Arlington*, 516 F.3d at 1112.  There is clear evidence that rationally and reasonably connects the evidence in the administrative record to the Assistant Secretary's finding.  *See id.*

### 6.    Frank Alto's "Corroborative" Letter

In the 2011 Decision, the Assistant Secretary determined that "[c]orroborative evidence that Marcus Alto was a non-tribal member being raised by Jose and Maria Alto is found in two letters from Frank Alto, drafted in 1910, identifying Jose, Maria, and himself as tribal members, but not mentioning Marcus Alto."  (AR 1154.)  Plaintiffs argue that this determination regarding to the corroborative value of these two letters is arbitrary and capricious based on the speculation of an anthropologist expert and Plaintiffs' opinion that the signatures on the two Frank Alto letters are "substantially different."  (Pls.' Mot. 18:4–23; Pls.' Reply 6:10–21.)

To the extent Plaintiffs argue the Assistant Secretary ignored or failed to assign the appropriate weight to the anthropology expert's speculation, the Court has already rejected similar arguments, and based on the same reasoning, rejects this one as well.  *See Thompson*, 885 F.2d at 555; *Modesto Irrigation*, 619 F.3d at 1036; *Arlington*, 516 F.3d at 1112.  The same reasoning also applies to Plaintiffs' criticism of the weight the

Assistant Secretary gave to the two letters written by Frank Alto.  *See id.*  The Assistant Secretary adequately explained the value of the letters in the greater context of other "documentary evidence from the time of Marcus Alto's childhood support[ing] the conclusion that the reason Marcus Alto was not listed on the early San Pasqual censuses was because an explicit, contemporaneous determination had been made that the child being raised by Jose and Maria was not their biological child." (*See* AR 1154.)  This reason alone is sufficient to affirm the Assistant Secretary's determination because there is clear evidence that rationally and reasonably connects this conclusion to evidence in administrative record.  *See Arlington*, 516 F.3d at 1112.

Even if the Court entertains the substance of Plaintiffs' challenge to the validity of the two letters based on their opinion that the signatures are "substantially different," the conclusion would remain the same.  Comparing the two letters, it is not clear that the signatures differ substantially. (*See* AR 154, 2707.)  More importantly, the contents of the two letters are largely similar, if not identical. (*Cf.* AR 154, 2707.)  It is difficult to read one of the letters (AR 154) because of the degraded quality, but from what the Court can glean, the letters appear to be written by the same person.  In particular, both letters end with the seemingly unique valediction "With best wishes to you I remain" followed by the signature.  (AR 154, 2707.)   The comprehensive index to the administrative record, which Plaintiffs submit as an exhibit to their motion, only confirms as much, stating that the letters are different versions of the same letter. (AR 5.)  The index does not, as Plaintiffs asserted during oral argument, recognize the signatures as being different, let alone "substantially different."   (*See id.*) Consequently, Plaintiffs' attack based on the respective signatures of the two letters lacks merit.

//

//

//

//

### 7.   Marcus Alto, Sr.'s Biological Father

For the final factual challenge, Plaintiffs argue that the Assistant Secretary's finding that Jose Alto is not Marcus Alto, Sr.'s biological father is arbitrary, capricious, clear error, and an abuse of discretion. (Pls.' Mot. 18:27–20:3.) Plaintiffs' challenge is made in two forms.  The first applies preclusion principles, contending that a determination regarding Marcus Alto, Sr.'s parentage in the 1995 Decision precludes the one made in the 2011 Decision. (*Id.* at 18:27–19:14.)  And the second is summed up in Plaintiffs' remark that the Assistant Secretary "did not make a rational connection to the agency record evidence in concluding that some other 'Jose Alto' was Marcus Alto Sr.' biological father." (*Id.* at 19:15–20:3.)

In the 2011 Decision, the Assistant Secretary found that Marcus Alto, Sr.'s adoptive father is not his biological father. (AR 1153.)  The starting point of the Assistant Secretary's analysis was Marcus Alto, Sr.'s 1907 baptismal certificate, which lists his parents as Jose Alto and Benedita Barrios.[15]  (AR 1153, 1513-14.)  Even though Jose Alto is the name of the father who reared Marcus Alto, Sr., the Assistant Secretary concluded that the Jose Alto listed on the 1907 baptismal record is not the same Jose Alto who reared Marcus Alto, Sr. (AR 1153-54.)  To reach that conclusion, the Assistant Secretary wrestled with two plausible theories: (1) "the certificate is referring to a different Jose Alto," based on evidence in the record that there were "a number of Jose Altos residing in the area at the time of Marcus's baptism"; and (2) "the 'father' named on the certificate is not really the biological father." (*Id.*)  Relying on early census records, the two 1910 Frank Alto letters, and affidavit testimony where Marcus Alto, Sr. "is said to have admitted he was 'adopted' and 'not Indian,'" the

---

[15] The 1907 baptismal certificate is for Robert Marco Alto. (AR 1513-14.)  The Assistant Secretary addressed the obvious disconnect between the name listed in the baptismal certificate and Marcus Alto, Sr.'s name. (AR 1149.)  Upon reviewing certain documents in the record, including a 1925 marriage certificate and a 1925 baptismal certificate for one of Marcus Alto, Sr.'s children, the Assistant Secretary concluded that the evidence taken together supported the conclusion that the 1907 baptismal certificate is for Marcus Alto, Sr. (*Id.*)  This finding is not in dispute.

Assistant Secretary ultimately concluded that the Jose Alto who reared Marcus Alto, Sr. is not his biological father.  (*Id.*)

Turning now to Plaintiffs' challenge, the Court rejects Plaintiffs' preclusion argument for the same reasons previously discussed in this order.   The policy recognizing a tribe's right to define its own membership for tribal purposes and the federal policy favoring tribal self-government in addition to the fact that 1995 Decision and the 2011 Decision are based on different regulations led this Court to conclude that strictly applying preclusion principles to these two agency decisions would be inappropriate.  *See Lasky*, 600 F.2d at 768.   That same holds true under these circumstances.

Plaintiffs' substantive challenge is understandable and reasonable.  The father's name listed on the 1907 baptismal certificate is Jose Alto, and the father who undisputedly reared Marcus Alto, Sr. is also named Jose Alto.  Plaintiffs diligently identify evidence throughout the administrative record that supports their proposition that the Jose Alto listed on the 1907 baptismal certificate is the same as the Jose Alto who reared Marcus Alto, Sr.  (*See* Pls.' Mot. 19:15–20:3.)  That evidentiary support includes the 1920 U.S. census listing Marcus Alto, Sr. as the "Indian" son of Jose and Maria Alto (AR 2431); Marcus Alto, Sr.'s marriage certificate stating he is "Indian" and his father is Joseph Alto who is "San Pasqual" (AR 2635); and several other documents demonstrating the same.  (Pls.' Mot. 19:15–20:3.)  However, what is important is not the existence of conflicting evidence or evidence supporting an alternative conclusion, but rather the existence of evidence supporting the agency's reasoning.  *See Modesto Irrigation*, 619 F.3d at 1036; *Arlington*, 516 F.3d at 1112.

Courts "must defer to a reasonable agency action 'even if the administrative record contains evidence for and against its decision.'"  *Modesto Irrigation*, 619 F.3d at 1036 (quoting *Trout Unlimited*, 559 F.3d at 958).  The Assistant Secretary noted that important evidence was unavailable to determine whether the Jose Alto who reared Marcus Alto, Sr. was his biological father, and even acknowledged "the fact that 'Jose

Alto' is the name given as the child's father on the baptismal certificate and is also the name of the man who raised the child establishes a strong presumption that the two are the same." (AR 1153.)

Recognizing the incomplete record and his own initial impressions, the Assistant Secretary thoroughly explained how the evidence in the record rebutted the presumption established by the baptismal certificate, with "[t]he most telling evidence in the record rebutting Jose Alto as Marcus Alto's biological father [being] the early BIA Indian censuses." (AR 1153-54.) He went on to explain:

> From 1907 through 1913, during which time Marcus Alto was undisputedly residing with Jose Alto and Maria Duro Alto, these censuses invariably identify Jose, Maria, and Jose's son, Frank Alto as tribal members and never list Marcus Alto. This fact cannot be written off as oversight; the entire purpose for taking these censuses was to identify and enumerate the people who were members of the San Pasqual Indians. And while there are not many young children included on these censuses, there certainly are some, rebutting any argument that Marcus Alto was too young for admission.

(AR 1154.)   The Assistant Secretary supported his conclusion further by citing corroborative evidence—the two Frank Alto letters drafted in 1910—that is consistent with census information indicating the nuclear family as including Jose Alto, Maria Duro Alto, and Frank Alto, but not Marcus Alto, Sr. (*Id.*)  Whether or not this Court agrees with the ultimate conclusion, the logic of this explanation—particularly, the weight given to the early Indian censuses as playing a foundational role in establishing the tribal membership roll—is transparent, reasonable, and supported by the administrative record. *See Arkansas*, 503 U.S. at 112; *Bayliss*, 427 F.3d at 1214 n.1.

The Assistant Secretary also identified "affidavit testimony refuting a biological connection between Marcus Alto and Jose Alto":

//

//

//

//

11cv2276

> It may well be true that people would refer to Marcus as "adopted" by Maria and Jose even if his biological parents were Jose and Benedita Barrios. But much of the testimony in the record is more specific. Many of the affidavits note that Marcus Alto was non-Indian and the child of a different family, not just a different mother. In particular, the 1994 affidavit of Dr. Shipek sets out unambiguously that "each elder maintained that Maria Duro Alto and her husband Jose Alto had no children but raised one belonging to a non-Indian family."

(AR 1154.) Dr. Shipek's long history working with and studying the San Pasqual Band is confirmed throughout the administrative record. (*See* AR 2100-34, 2186-89, 2191-92, 2195-96.) Even Dr. Grabowski's June 2008 analysis relied heavily on Dr. Shipek's research. (AR 2058-89.) It comes as no surprise that Dr. Shipek's thorough research would be given considerable weight by the Assistant Secretary.

Even though the administrative record contains evidence supporting Plaintiffs' position against the findings in the 2011 Decision, the Assistant Secretary's conclusion is a reasonable product derived from that evidence in the administrative record. *See Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007). As a result, the Court must defer to the Assistant Secretary's conclusion despite the existence of evidence against that conclusion. *See Modesto Irrigation*, 619 F.3d at 1036.

## IV.   CONCLUSION & ORDER

Plaintiffs' frustration is understandable. The record strongly suggests that the San Pasqual Band has engaged in a relentless battle to disenroll Marcus Alto, Sr. and his descendants from the very beginning. For the most part, that battle appeared to be one that Plaintiffs were winning all the way up to the Regional Director's November 2008 decision. (AR 1267-75.) Then suddenly, in a complete about face, the Assistant Secretary reversed the Regional Director's decision, found in favor of the Band, and followed the recommendation to disenroll Marcus Alto, Sr.'s descendants. (AR 1137-56.)

//

However, the Court's role in this situation is "not to substitute its judgment for that of the agency," but rather to examine whether there is a "rational connection between the facts found and the choice made" by the agency. *Bonneville Power*, 477 F.3d at 687 (quoting *State Farm*, 463 U.S. at 43) (internal quotation marks omitted). The Assistant Secretary was tasked with the unenviable responsibility to review thousands of pages in the administrative record, some of which are over a hundred years old, and determining the membership status of the now-deceased Marcus Alto, Sr.   Plaintiffs expend considerable effort to identify facts in the record either unmentioned, potentially ignored, or devalued, but as the Court has repeatedly stated, it "must defer to a reasonable agency action 'even if the administrative record contains evidence for and against its decision.'" *Modesto Irrigation*, 619 F.3d at 1036 (quoting *Trout Unlimited*, 559 F.3d at 958).   The failure to address the substantial deference afforded to agency decisions—particularly for factual determinations—was a recurring flaw in Plaintiffs' reasoning. *See Arkansas*, 503 U.S. at 112; *Melkonian*, 320 F.3d at 1065.

Under the standard prescribed by 5 U.S.C. § 706(2)(A), which is highly deferential to the agency, Plaintiffs fail to meet their burden to demonstrate that the Assistant Secretary's decision is in any way "arbitrary, capricious, an abuse or discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A); *San Luis & Delta-Mendota*, 747 F.3d at 601.   Plaintiffs also fail to demonstrate that the Assistant Secretary's decision is not supported by "substantial evidence." *See Love Korean Church*, 549 F.3d at 754; *Bear Lake Watch*, 324 F.3d at 1076.   Upon this Court's review of the 2011 Decision, the Assistant Secretary articulated a rational relationship between his factual findings and conclusions. *See Fence Creek Cattle*, 602 F.3d at 1132.

In light of the foregoing, the Court **DENIES** Plaintiffs' motion for summary judgment, and **GRANTS** Defendants' cross-motion for summary judgment. Accordingly, this Court affirms the Assistant Secretary's 2011 Decision "revers[ing]

the decision made by the Pacific Regional Director on November 26, 2008" and concluding that "the enrollment of the Marcus Alto Sr.[] descendants was based on information subsequently determined to be inaccurate and, as a result, their names must be deleted from the Band's roll." (*See* AR 1156.)

**IT IS SO ORDERED.**


**DATED: September 30, 2015**

**Hon. Cynthia Bashant**
**United States District Judge**